**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

Case No. _____

JOHN WISEMAN, an individual
(derivatively on behalf of nominal
Defendant, Digital-1, Inc., an
Ohio corporation),

    Plaintiff,

v.

EDWIN DIAZ, an individual, and
Digital-1, Inc., an Ohio corporation,

    Defendants.
_____/

**COMPLAINT**

Plaintiff, JOHN WISEMAN ("Wiseman"), an individual (derivatively on behalf of nominal Defendant, Digitial-1, Inc. ("D-1")), by and through undersigned counsel, hereby files this lawsuit against Defendant, Edwin Diaz ("Diaz"), and nominal Defendant, D-1, and in support thereof, states as follows:

**PARTIES**

1. Wiseman is a citizen of Nevada.

2. Diaz is a citizen of Florida.

3. D-1, a citizen of Ohio, is an Ohio closely held corporation that has ceased operations, and has an office located at 930 Deneen Ave., Suite B, Monroe, OH 45050.

4. Wiseman maintains at least a thirty percent (30%) ownership interest in D-1.

5. Diaz maintains a majority ownership interest in D-1.

6. D-1 is named as a nominal defendant in this action solely in a derivative capacity.

7. Wiseman asserts that Diaz is not entitled to recover from any judgment obtained by Wiseman in this action, because Diaz committed the wrongful conduct contained herein.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between Wiseman, D-1, and Diaz, and because the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

9. Venue in this Court is appropriate, pursuant to 28 U.S.C. §§1391(b)(2), and (b)(3).

## FACTUAL ALLEGATIONS

10. On or about December 5, 2016, ECP of Cincinnati, LLC, an Ohio limited liability company ("ECP"), was formed for the business of, *inter alia*, refurbishing remote controls and power supplies for companies, including, but not limited to, Comcast and Cincinnati Bell.

11. On or about April 24, 2017, Diaz met with Tom Whiteaker ("Whiteaker"), Steve Christopher, and Neil Brasfield ("Brasfield") at ECP's facility in Ohio to discuss, *inter alia*, Diaz potentially investing in ECP (the "Meeting").

12. Wiseman appeared at the Meeting via teleconference.

13. Diaz controlled the Meeting, and toured both the ECP facility and a potential new building to which to move ECO's operations.

14. Diaz decided that he did want to invest in ECP, but suggested that he, Whiteaker, Wiseman, and Brasfield form a new company to conduct the same business as ECP, which company inevitably became D-1.

15. On or about April 24, 2017, Brasfield, Wiseman, Whiteaker, and Diaz entered into

a verbal agreement (the "Investment Agreement") relating to their collective ownership in, and the operation of, D-1.

16. Pursuant to the Investment Agreement, it was agreed that Brasfield, Wiseman, and Diaz, would each maintain a thirty percent (30%) ownership interest in D-1, with Whiteaker maintaining a ten percent (10%) ownership interest in D-1.

17. In exchange for his thirty percent (30%) ownership in D-1, pursuant to the Investment Agreement, Diaz was required to invest One-Hundred Thousand Dollars ($100,000.00), in a lump sum payment, into D-1 (the "Diaz Investment").

18. Wiseman later learned that Diaz did not contribute the entirety of the Diaz Investment and, upon information and belief, only invested Eight-Five Thousand Dollars ($85,000.00) in D-1.

19. In exchange for their respective thirty percent (30%) ownership interests in D-1, Brasfield, and Wiseman, agreed to cause ECP to transfer certain of its assets, and receivables, to D-1.

20. Brasfield, and Wiseman, had both previously invested One Hundred Thousand Dollars ($100,000.00) each into ECP.

21. Brasfield, Wiseman, and Whiteaker, agreed to use their reasonable best efforts to ensure that all payments made to ECP from Comcast, and Cincinnati Bell, related to work performed by D-1, would be paid directly to a bank account in D-1's name.

22. Brasfield, Wiseman, and Whiteaker, advised Diaz that they had no control over when these direct payments would be made to D-1, as opposed to ECP, because the timing, or occurrence of such, was within the sole and exclusive discretion of Comcast, and Cincinnati Bell.

23. Pursuant to the Investment Agreement, Brasfield was named CEO/President of D-

1, Wiseman was named the Vice President of D-1, and Diaz was named the Treasurer, and Secretary, of D-1.

24. As Treasurer, and Secretary, of D-1, Diaz was responsible for D-1's finances, including the payment of its bills.

25. As part of the Investment Agreement, Diaz agreed to faithfully perform his duties and responsibilities as Secretary, and Treasurer, of D-1.

26. In connection with his retention as Treasurer, and Secretary, of D-1, Diaz opened up a bank account in name of D-1 at Bank of America (the "BOA Account").

27. Based upon his promises that he would faithfully execute his duties, and responsibilities, as Secretary, and Treasurer, of D-1, Wiseman agreed to Diaz serving as such for D-1.

28. Unbeknownst to Wiseman at the time he entered into the Investment Agreement, Diaz had no intention of making the Diaz Investment to D-1, nor any intent to faithfully carry out his duties, and responsibilities, as Treasury, or Secretary, of D-1.

29. Instead, Diaz refused to provide Brasfield, Wiseman, and Whiteaker with access to the BOA Account, and D-1's financial information, in an effort to slowly wrest control of D-1 from its other owners.

30. On or about May 8, 2017, Brasfield incorporated D-1.

31. Under Ohio law, the law that governs this proceeding, Diaz, as a shareholder in a closely held corporation, which D-1 is, owed Wiseman a fiduciary duty of the utmost fairness and loyalty.

32. A fiduciary relationship also existed between Diaz, on the one hand, and Wiseman, on the other, because the Wiseman reposed trust and confidence in Diaz.

33. Diaz also owed D-1 a fiduciary duty.

34. In connection with his duties, and responsibilities, as Secretary, and Treasurer, of D-1, Diaz was provided with historical ECP financial information, so he could create a new a QuickBooks account for D-1.

35. Due to a loss of production attributable to employee retention issues, D-1 failed to reach its financial "target" for June 2017, to which Diaz voiced his displeasure.

36. Despite Brasfield's, Wiseman's, and Whiteaker's best efforts, the migration of the Comcast, and Cincinnati Bell, receivables from ECP's bank account, to D-1's bank account (the BOA Account) had still not occurred as of June 2017.

37. The delay was attributable to the proverbial "red-tape" associated with large companies.

38. Despite the issues with the migration, all funds received by ECP from Comcast, and Cincinnati Bell, were either transferred directly to the BOA Account, or used for the benefit of D-1, including the payment of D-1's rent.

39. On or about July 20, 2017, Comcast advised D-1 that it was moving its business to another vendor, and would stop sending inventory to be processed by D-1 after August 2017.

40. Comcast did allow D-1 to "work" the Comcast product it still had, which had a value in the hundreds of thousands of dollars to D-1.

41. As a result of its decision to cease sending D-1 product, Comcast refused to transition its receivables to D-1, as it viewed same as unnecessary given it would soon be conducting no business with D-1.

42. In or around August 2017, Diaz began complaining about his "return on investment" into D-1.

43. This was interesting, because at the time, Diaz had already breached the Investment Agreement by, *inter alia*, failing to contribute the Diaz Investment to D-1.

44. Moreover, despite it being requested multiple times that he do so, Diaz never provided the other owners of D-1 with access to D-1's financial information.

45. On or about October 12, 2017, the Cincinnati Bell migration from ECP to D-1 occurred.

46. Also, in or about October 2017, Diaz demanded to Wiseman that he wanted to be "bought out."

47. On or about November 9, 2017, D-1 learned that Diaz had stopped paying D-1's bills.

48. On or about November 16, 2017, Whiteaker sent Diaz an email in which he requested that Diaz cause D-1 to pay $12,000.00 due and owing to D-1 vendors, but Diaz refused to do so.

49. Indeed, Diaz even prevented D-1 from paying the rent for its facility.

50. Diaz's nefarious conduct continued in December 2017, during which time he continued to cause D-1's bills to not be paid, and continued to withhold access to D-1's financial information.

51. Diaz even went so far as to advise Whiteaker that Diaz "owned" D-1, and Whiteaker should not communicate with Brasfield, or Wiseman, despite their actual ownership interest in D-1.

52. Diaz also converted at tens of thousands of dollars of D-1 funds for his personal use.

53. As a result of same, by letter dated January 16, 2019, D-1 sent Diaz that certain

"Statutory Notice pursuant to Ohio Revised Code §2307.61" (the "Civil Theft Letter") advising Diaz, *inter alia*, that Diaz had unlawfully converted Twenty-Nine Thousand Dollars ($29,000.00) in D-1 Funds, and demanding that he make payment of Eighty-Seven Thousand Dollars ($87,000.00) within thirty (30) days of the date of service of the Civil Theft Letter.  A copy of the Civil Theft Letter is attached hereto at Exhibit "A."

54. Diaz did not comply with the demand set forth in the Civil Theft Letter.

55. As a result of Diaz's actions, including, *inter alia*, not paying D-1's bills, and converting D-1 funds for his own personal use, Diaz caused D-1 to lose hundreds of thousands of dollars as a result of same because, *inter alia*, it could not "work" the product that Comcast permitted it to.

56. Had Diaz not refused to pay D-1's bills, it could have continued to work the Comcast product, and made hundreds of thousands of dollars.

57. Diaz's actions also caused D-1 to default on its lease, pursuant to which it lost its $20,000.00 down payment with its landlord.

58. The "demand requirement" that would otherwise be in effect is excused in this proceeding, because (i) Diaz is a majority shareholder who would never sue himself; (ii) there is self-dealing by Diaz such that Diaz gained from same; and (iii) Diaz dominates D-1.

59. All conditions precedent to the filing of this lawsuit have occurred or been waived.

## COUNT I – BREACH OF FIDUCIARY DUTY

60. Wiseman repeats and realleges each of the foregoing allegations in paragraphs 1 – 59 as if more fully set forth at length herein.

61. Diaz owed D-1 a fiduciary duty of the utmost fairness and loyalty.

62. Diaz breached his fiduciary duty to D-1 by, *inter alia*, converting D-1 funds for his

own personal use.

63. Diaz's breach of fiduciary duty has directly and proximately caused, and continues to cause, Wiseman to suffer substantial damages.

WHEREFORE, Wiseman demands judgment against Diaz, and D-1, for damages in an amount to be determined, including punitive damages, and attorneys' fees and costs, together such other, and further, relief as the Court deems just, equitable and proper.

## COUNT II – UNJUST ENRICHMENT

64. Wiseman repeats and realleges each of the foregoing allegations in paragraphs 1 – 59 as if fully set forth at length herein.

65. By unlawfully converted D-1 funds, a benefit was conferred on Diaz.

66. Diaz voluntarily accepted and retained the benefit conferred on him.

67. The circumstances are such that it would be inequitable for Diaz to retain the benefit without paying the value thereof.

WHEREFORE, Wiseman demands judgment against Diaz, and D-1, for damages in an amount to be determined, including punitive damages, and attorneys' fees and costs, together such other, and further, relief as the Court deems just, equitable and proper

## COUNT III – CIVIL THEFT

68. Wiseman repeats and realleges each of the foregoing allegations in paragraphs 1 – 59 as if fully set forth at length.

69. Wiseman has been injured by a criminal act committed by Diaz; *to wit*, his unlawful conversion of D-1 funds, which constitutes a "theft defense" as defined by Ohio Revised Code § 2913.01(K)(1).

70. At the time that Diaz unlawfully converted D-1's property, D-1 owned the subject

funds.

71. Diaz converted D-1's funds by a wrongful act or disposition.

72. Wiseman has suffered damages as a result of Diaz's civil theft.

WHEREFORE, Wiseman demands judgment against Diaz, and D-1, for damages in an amount to be determined, including punitive damages, and attorneys' fees, and costs, together with such other, and further, relief as the Court deems just, equitable and proper.

## COUNT VII - CONVERSION

73. Wiseman repeats and realleges each of the foregoing allegations in paragraphs 1 – 59 as if fully set forth at length.

74. At the time that Diaz unlawfully converted D-1's property, D-1 owned the subject funds.

75. Diaz converted D-1's funds by a wrongful act or disposition.

76. Wiseman has suffered damages as a result of Diaz's civil theft.

WHEREFORE, Wiseman demands judgment against Diaz, and D-1, for damages in an amount to be determined, including punitive damages, and attorneys' fees, and costs, together with such other, and further, relief as the Court deems just, equitable and proper.

Dated: December 11, 2019                    Respectfully submitted,

/s/ Richard S. Lubliner
Richard S. Lubliner, Esq.
FBN: 0047741
Lubliner Law PLLC
1645 Palm Beach Lakes Blvd., Suite 1200
West Palm Beach, FL 33401
rich@lubliner-law.com
Carolina@lubliner-law.com

## VERIFICATION

I, John Wiseman, have read the foregoing Complaint, and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Hennepin County, Minnesota.

Executed on this December 10, 2019.

JOHN WISEMAN

## ACKNOWLEDGEMENT

STATE OF MINNESOTA )
)
COUNTY OF Hennepin )

On this December 10, 2019, before me, the subscriber, personally appeared John Wiseman, who has satisfactorily provided to me sufficient identification or is personally known to me, and he acknowledged under oath that the statements made in this Complaint are true and correct to the best of his knowledge, and he executed and delivered the within Verification as his voluntary act and deed for the uses and purposes therein expressed.

NOTARY PUBLIC
(Seal)



AMANDA LYNETTE EBERLE
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2022